Filed 12/2/22  P. v. Johnson CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> KENDAL JOHNSON, <br><br>     Defendant and Appellant. | B314638 <br><br> (Los Angeles County Super. Ct. No. TA124347) |

APPEAL from an order of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Kendal Johnson (defendant) appeals the trial court's denial of his Penal Code section 1172.6 (former Penal Code section 1170.95) petition for vacatur of his murder conviction.[1] We are asked to decide whether the prosecution established beyond a reasonable doubt that defendant is ineligible for relief under section 1172.6; whether the statutory process that calls on a trial court, rather than a jury, to determine defendant's eligibility for resentencing violates his constitutional rights; and whether we should remand the matter to the trial court for consideration of whether he is entitled to relief as to his separate attempted murder conviction under the current version of section 1172.6—i.e., as amended by Senate Bill No. 775 (2021-2022 Reg. Sess.) following the hearing on his petition.

## I. BACKGROUND

### A. The Murder

Willie Adams Jr. (Adams) was an East Coast Crips gang member who sold rock cocaine out of his apartment on Stanford Avenue in Los Angeles. His apartment was located in the territory of the Avalon Garden Crips, a rival gang.

Approximately two weeks before victim Adams' murder, Donna Joubert (Joubert), Adams' downstairs neighbor, witnessed people threatening Adams, telling him he couldn't sell drugs in

---

[1] Undesignated statutory references that follow are to the Penal Code.

the apartment building, and saying he was going to have problems if they heard he was selling drugs.[2]

On July 24, 2009, at around 5:30 or 6:00, Joubert saw co-defendant Keith Fuller (Fuller) walking by and looking up at Adams' apartment.[3] Sometime after midnight, in the early hours of July 25, 2009, Renee Sharp (Sharp), another downstairs neighbor of Adams, was standing across the street from the apartment building when she saw people harassing Adams. Sharp began crossing the street, heard a gunshot, and saw the people take Adams upstairs. Sharp returned to her apartment, from which she could hear yelling, arguing, and ultimately more gunshots.

Glenda Adkins (Adkins), a former member of the 102 East Coast Crips, was "working the door" at Adams' apartment, i.e., letting people in and out to buy drugs. Malcolm Wilson (Wilson) was also at the apartment. Adkins heard Adams' van pull up. A

---

[2]     At defendant's later criminal trial, Joubert denied witnessing Avalon gang members harassing Adams in the weeks before his murder. After her testimony, Detective Mario Aguilar testified he interviewed Joubert after the murder. An excerpt of a recording of the interview, during which she described the harassment prior to the murder, was played for the jury.

[3]     At trial, Joubert testified she did not recall seeing anyone looking up at the apartment the evening before the murder. The prosecution introduced evidence that Joubert spoke with Detective Gerardo Pantoja in November 2009. During that interview, she identified Fuller on a photo identification report and stated she observed him looking up at Adams' apartment sometime prior to the murder. Joubert also acknowledged she wrote a statement to that effect on a photo identification report.

few minutes later, she heard Adams ask her to open the door. She complied, and Adams, whose face was bleeding and whose t-shirt was bloody, was pushed in at gunpoint by co-defendant Dashawn Combs (Combs).[4]

Adams had bullet-hole shaped blood spots on his tank top. Defendant and Fuller followed Adams and Combs into the apartment. Adkins saw all three men (defendant, Combs, and Fuller) carrying guns. The men referenced the Avalon Gardens gang and asked where the "dope" was located.[5] Adkins and Wilson were instructed to get on the floor face down, which they did. Combs gave orders, and defendant followed those orders. The men ransacked the apartment. Wilson was kicked while on the floor. Fuller hit Adkins in the head with a gun.

Combs took Adams into a bedroom and made him take off some of his clothes.[6] Defendant and Fuller tore up the apartment to find rock cocaine, and found it on a plate in a cabinet in the kitchen. Defendant and Fuller also took marijuana from a countertop.

---

[4] Wilson testified he was also responsible for opening the door at the apartment. According to Wilson, he heard Adams ask for them to open the door, he opened the door, and he had a gun pointed in his face. Wilson said two of the defendants were holding Adams up and the third was pointing a gun in his face. He testified only one of the perpetrators had a gun.

[5] Defendant, Fuller, and Combs, were all members of the Avalon Garden Crips.

[6] Adkins testified Combs made Adams "get naked." Sharp, who testified she saw Adams lying dead on the kitchen floor after the shooting, said Adams was wearing nothing but a t-shirt.

At some point, defendant and Fuller left the apartment.[7] Defendant and Fuller whistled at Combs, urging him to follow. Combs brought Adams back into the kitchen and shot him after ordering him to get on the floor. Wilson was also shot, but he survived.

A "shots fired" call in the vicinity of Adams' apartment went out around 2:15 a.m. Los Angeles Police Department Officers responded. Among them was Officer Oscar Villareal, who observed blood spots on the sidewalk in front of Adams' apartment complex and followed the blood trail to the front door of Adams' unit. Officer Villareal entered the apartment and observed blood spots in the living area and Adams' partially nude body between the kitchen and living area. The apartment appeared to have been ransacked.

Officers discovered four expended casings in the living room, two shell casings, and a fired bullet. Another shell casing was found in a bedroom. An autopsy revealed Adams sustained three gunshot wounds. Defendant's fingerprints were recovered from a white plate on the kitchen sink counter.

### B.    The Initial Criminal Proceedings

Defendant (along with co-defendants Combs and Fuller) was charged in an amended information with murdering Adams in the commission of robbery and burglary (count 1). The

---

[7]    At defendant's trial, Adkins was asked whether defendant and Fuller were still in the apartment when Combs shot Adams. She said defendant "was the first one out the door" "and then [Fuller] left behind him." Adkins also testified Combs "was the last one" and specified "[t]hat's when he turned back around and shot [Wilson] . . . ."

5

information additionally charged defendant (and the co-defendants) with attempting to murder Wilson (count 2), first degree burglary (count 3), and two counts of home invasion robbery—with Adams and Wilson as the named victims (counts 4 and 5, respectively). The information further alleged all five counts were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by the gang. Personal discharge and principal-armed firearm enhancements were also alleged in connection with counts 1, 2, 4, and 5.

Defendant was tried separately from co-defendants Fuller and Combs. Adkins, Wilson, Sharp, and Joubert testified at trial, along with a number of police officers and others involved in the investigation.[8]

The jury was instructed on, among other legal principles, aiding and abetting, murder with malice aforethought, felony murder, and attempted murder (including principles of premeditation and deliberation). The attempted murder instruction informed the jury that the People must prove defendant "took at least one direct but ineffective step toward killing another person" and defendant "intended to kill that person." The deliberation and premeditation instruction associated with the attempted murder charge informed the jury it must decide whether the People proved that the attempted murder was committed willfully, and with deliberation and

---

[8]     As mentioned *ante* and described in some detail in the prior appellate opinion in this case, various aspects of the testimony Adkins and Joubert gave at trial conflicted with prior statements they had given to the police. (*People v. Johnson* (Mar. 30, 2017, B262599) [nonpub. opn.].)

premeditation, if it found defendant committed attempted murder. The jury was not instructed on aiding and abetting liability under the natural and probable consequences doctrine in connection with the attempted murder charge.

Defendant was convicted on all five counts. As to count 1, the jury found him guilty of first degree murder and found true the allegations that he committed the murder while engaged in the crimes of robbery and burglary. The jury also found true, in connection with counts 1, 2, 4, and 5, the gang allegations and the allegations that a principal personally and intentionally discharged a firearm proximately causing great bodily injury and death to Adams. The jury found not true all allegations that defendant personally used or discharged a firearm. Defendant was sentenced to life in prison without parole, along with additional terms both consecutive and concurrent.

On direct appeal of the criminal judgment, another panel of this court affirmed his conviction, with some modifications to his sentence. (*People v. Johnson* (Mar. 30, 2017, B262599) [nonpub. opn.].)

### C. *Defendant's Petition for Resentencing*
#### 1. *The petition*
Defendant filed a section 1172.6 petition for resentencing in June 2021. Defendant asserted he was convicted of first or second degree murder pursuant to the felony murder rule and could not now be convicted of first or second degree murder because of changes made to Penal Code sections 188 and 189— specifically, because he was not Adams' actual killer, did not aid and abet the killer with the intent to kill, and was not a major

7

participant in the felony who acted with reckless indifference to human life.[9]

The trial court (the same judge who presided over defendant's trial) found defendant made a prima facie case for resentencing, appointed counsel for defendant, and set a hearing on the petition.

The People opposed the petition and submitted the trial transcripts from defendant's trial and from Fuller and Combs' trial, the clerk's transcripts from both cases, and trial exhibits. Defendant objected to the prosecution's submission of the Fuller and Combs materials.[10] At the section 1172.6 hearing, defendant also presented new evidence: his testimony.

### 2. Summary of defendant's testimony at the hearing

Defendant was a member of the Avalon Garden Crips gang, and had been a member in July 2009. He was in the area of Adams' apartment complex, which he claimed was located in gang-neutral territory, at around 10 or 11 p.m. on the night of the murder.

---

[9] Defendant's petition did not reference his attempted murder conviction, but the brief defendant filed after filing the initial petition did. The brief stated that it appeared section 1170.95 did not apply to that conviction because "there was no natural and probable consequences instruction."

[10] The objection is not pressed on appeal. As defendant states, the trial court did not reference the transcripts of the Fuller and Combs trial in its ruling on defendant's section 1172.6 petition.

8

At that time, defendant joined a conversation involving an older man, during which the older man told them about drugs being sold at Adams' apartment. Fuller and Combs—who defendant described as a "nobody" and a kid with "no say"—also joined the conversation. Defendant knew Fuller and Combs were Avalon Garden Crips gang members too, but he was not close to them. Defendant was close to Combs' older brother; Combs was younger than defendant.

After the conversation, Fuller and Combs left. Defendant then saw Fuller and Combs moving toward Adams' apartment building, assumed they intended to rob someone, and took off running. Defendant retrieved a sweater from his car and caught up with the two when they were on their way upstairs; he intended to participate in a robbery to get money and drugs. Defendant did not have a gun, but he was pretty sure someone had a gun because you need a gun to perform a robbery. Defendant explained a weapon would be necessary to scare the victims and asserted it would be something to be used if needed.

As defendant ran up the stairs behind Fuller and Combs, Adkins opened the apartment door and moved out of the way. Defendant could not see Adams, but he saw there was blood "up the stairs." Defendant entered the apartment behind the other two men, ran straight to the kitchen, opened cabinets, located and took drugs and money, and ran off. Defendant did not know what Fuller and Combs were doing. When he left the kitchen, defendant saw Adkins and Wilson laying on the floor. Defendant did not want the other men to know he had the money because he did not want to share, so he pocketed the money and left with the drugs.

9

Defendant denied hearing any gunshots.  He also denied hearing any yelling.  Defendant said he was in the apartment for less than five minutes.

### 3.     *The trial court's ruling*

The trial court denied defendant's section 1172.6 petition, finding defendant was a major participant in Adams' murder who acted with reckless indifference to human life.

The trial court opined it was very hard to believe, given the way the robbery was conducted (the three defendants watched for Adams to return home around 2 a.m. before they struck), that it was not planned in advance.  The court believed aspects of defendant's testimony made no sense, e.g., that he divined Fuller and Combs were going to commit a robbery merely from their moving in the direction of Adams' apartment.  The court did credit defendant's testimony that you would need a gun to rob a "drug house," but the court did not believe his statement that there was no previous conversation about who would have guns and how the robbery was going to occur.

The court found the evidence indicated defendant was part of the ransacking of the apartment, during which Adkins was pistol-whipped and Wilson was kicked.  This was the time at which Combs took Adams into his bedroom and ordered him to take off his clothes.  The court noted the apartment was a small space and emphasized the testimony in the case did not suggest defendant left a few minutes into the crime while Fuller and Combs continued the robbery.  Instead, in the trial court's view, the testimony was that Combs executed Adams, and attempted to execute Wilson too, as defendant and Fuller were leaving.

10

The trial court accordingly concluded defendant satisfied the *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) definition of a major participant in a crime. The court found defendant had a role in planning the criminal enterprise that led to Adams' death, emphasizing that the perpetrators waited until Adams returned to his apartment and then committed the crime, which was evidence of advance planning. There was no direct evidence defendant supplied any guns used in the crime, but defendant's testimony indicated he knew guns were going to be used during the robbery and the court believed he in fact knew guns had been used during the course of the crime. The court acknowledged there was no evidence establishing beyond a reasonable doubt that defendant was present at the actual moment of the fatal shooting (or knew in advance that Combs would execute Adams and attempt to kill Wilson), but the court opined defendant was still in a position to prevent the murder because he was present at the scene of the crime and was older than Combs (who defendant described as a "nobody"). Nonetheless, the trial court observed, defendant did nothing to prevent anyone from getting hurt because he just wanted drugs and money.

The trial court also found defendant acted with reckless indifference to human life as that concept is explained in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). Defendant knew weapons were going to be used in the robbery. He was involved in the robbery and had an opportunity to stop the killing or aid the victim. Once they entered the apartment, the crime lasted seven to fifteen minutes, during which Adkins and Wilson were lying on

11

the floor and Adams was restrained and told to strip. The court also found defendant did not attempt to minimize the violence.[11]

## II. DISCUSSION

The three bases for reversal defendant advances are all unpersuasive.

As for the sufficiency of the evidence, defendant does not challenge the finding that he was a major participant in the underlying crimes; the only contested issue is whether his conduct exhibited a reckless indifference to human life. Substantial evidence supports the trial court's determination that it did. Defendant participated in a middle-of-the-night, armed home invasion robbery of a rival gang's apartment used for selling drugs. There was evidence he was present for nearly all of what transpired during that robbery and made no effort to prevent the violence that occurred. The trial court also fairly inferred that defendant participated in the planning for the robbery, and the totality of the circumstances suffices to establish the requisite indifference.

Defendant's constitutional challenge to the section 1172.6 procedure (assigning trial courts, not juries, to determine whether relief is warranted) also fails. A jury determination is

---

[11] The trial court expressly addressed our Supreme Court's revisitation of the reckless indifference to life concept in *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*). In addition to the facts already discussed, the trial court emphasized two or three guns were used in the commission of the crime and defendant was present at the crime scene. Defendant's knowledge of his confederate's propensity for violence or likelihood of using lethal force, on the other hand, was unknown.

not required because section 1172.6 does not increase punishment; it is instead an avenue for a possible reduction in sentence. There is also no equal protection problem with the procedure chosen by the Legislature.

Finally, as to the effect of recent substantive amendments to section 1172.6, we need not remand the matter for the trial court to determine whether defendant is eligible for relief on his attempted murder conviction. The record demonstrates the jury was not instructed on the natural and probable consequences doctrine in connection with the attempted murder charge and defendant is thus ineligible for resentencing as a matter of law.

### A. *Section 1172.6 and Appellate Review*

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95 [now renumbered as section 1172.6], which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief. [Citation.]" (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

In October 2021, Senate Bill No. 775 was enacted and amended former section 1170.95, effective on January 1, 2022. (Stats. 2021, ch. 551, § 1). As a result of these amendments, section 1172.6 provides that "person[s] convicted of felony murder

13

or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1172.6, subd. (a).) If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the trial court must issue an order to show cause. If an order to show cause issues, the court then "hold[s] a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts," unless the parties "waive a resentencing hearing and stipulate that the petitioner is eligible to have his or her . . . conviction vacated and to be resentenced." (§ 1172.6, subd. (d)(1)-(2).) "At the hearing . . . the burden of proof . . . [is] on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder . . . ."[12] (§ 1172.6, subd. (d)(3).)

On appeal from a trial court's order denying a section 1172.6 petition following a subdivision (d)(3) hearing, this court evaluates the sufficiency of the evidence for the court's determination using the substantial evidence standard of review.

---

[12] The trial court held the order to show cause hearing on defendant's petition prior to the effective date of Senate Bill No. 775. With the exception of defendant's argument regarding his attempted murder conviction, defendant does not argue the trial court's analysis is infirm under the prevailing version of section 1172.6. We have reviewed the trial court's ruling and conclude it comports with current law.

14

(*People v. Garrison* (2021) 73 Cal.App.5th 735, 747.)  Questions of law are reviewed de novo.  (*Lewis*, *supra*, 11 Cal.5th at 961.)

> **B.**    *Substantial Evidence Supports the Trial Court's Finding that Defendant Exhibited the Requisite Reckless Indifference to Life*

A defendant who is a major participant in a murder and exhibits reckless indifference to human life can be convicted of felony murder under current law and is therefore ineligible for section 1172.6 relief.  (§ 1172.6, subds. (a)(3), (d)(3); see also § 189, subd. (e)(3).)  That is the case here.

*Clark*, *supra*, 63 Cal.4th 522, outlined how courts should determine whether a defendant acted with reckless indifference to human life.  (*Id.* at 618-623.)  Our high court recently recounted the pertinent factors with some elaboration in *Scoggins*, *supra*, 9 Cal.5th 667: "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?  [Citation.]  "'[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.'"  (*Id.* at p. 618, quoting *Banks*, *supra*, 61 Cal.4th at p. 803.)"  (*Scoggins*, *supra*, 9 Cal.5th at 677.)  As *Scoggins* explains, "[r]eckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'"

(*Scoggins*, *supra*, 9 Cal.5th at 676.) The concept "'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.'" (*Id.* at 676-677.) Participation "in a garden-variety armed robbery" where "death might be possible but not probable" is accordingly insufficient. (*Banks*, *supra*, 61 Cal.4th at 802.)

Substantial evidence supports the trial court's determination that these factors reveal defendant harbored the requisite reckless indifference at the time of Adams' murder. Regarding gun use and numerosity, even defendant's own testimony establishes he knew in advance a gun would be used; as he put it, you need a gun to perform a robbery. But apart from defendant's version of events, there was evidence (Adkins' testimony) that all three assailants—including defendant—were carrying guns when they entered Adams' apartment. And while it is true the jury found only Combs fired the fatal shot, there was also evidence that the robbers used their guns to obtain compliance from the victims (e.g., Fuller striking Adkins in the head with his gun while defendant was present at the scene).

The factors related to defendant's role in the crime and its duration also support the trial court's ruling. It is undisputed defendant was physically present for the home invasion robbery, entering Adams' apartment with Combs and Fuller and ransacking it while searching for drugs and money. Although (as the trial court found) the prosecution did not establish beyond a reasonable doubt that defendant was present when the fatal shot was fired, he was present when acts of violence were perpetrated

16

on all three victims.[13]  The use of actual violence (including the rather ominous command that Adams disrobe) would reasonably indicate to any participant in the crime a greater risk of lethal violence than a garden variety armed robbery where only threats and intimidation are used.[14]  The trial court also found the robbery lasted approximately seven to fifteen minutes, which is a fairly significant stretch of time—not a quick, in-and-out episode.  These are all aggravating factors under the *Clark* and *Scoggins* criteria.

Consideration of defendant's knowledge about his confederates' propensity for violence or likelihood of using lethal force is less straightforward.  The trial court correctly found there was no evidence defendant knew in advance his accomplices were

---

[13]  Adkins testified defendant was present when Adkins and Wilson were instructed to get on the ground, when Adkins was hit with a gun, when Wilson was kicked, and when Combs took Adams into another room in the apartment and forced him to strip.

[14]  Indeed, this was not a standard armed robbery.  Rather, it was a middle-of-the-night home invasion robbery of a drug dealer in a rival gang.  The evidence indicates defendant and the others waited to carry out the crime until Adams was arriving at his home, accosting him outside and forcing him to secure their access to his apartment at gunpoint.  It thus carried a particularly high risk of deadly violence.  (See, e.g., *In re McDowell* (2020) 55 Cal.App.5th 999, 1013 [armed home invasion robbery of drug dealer posed obvious risk of lethal violence evidencing reckless indifference to human life]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089-1090 [planned armed robbery of drug dealer at his home is factor showing reckless indifference].)

17

likely to use lethal force. But there is evidence that defendant, Fuller, and Combs were all in the same criminal street gang and that defendant was present during all or nearly all of the seven to fifteen minute episode where violence was used. Defendant's presence when violence was used—before culminating minutes later in Adams' murder—is some evidence he had advance knowledge of his accomplices' propensity for violence. But the record does not establish defendant knew before taking part in the home invasion robbery at Adams' apartment that Combs and Fuller were especially violent individuals or likely to use lethal force. Overall, then, we are of the view that the propensity for violence considerations do not strongly militate in favor of a reckless indifference to life finding.

Finally, and in significant contrast, there was solid evidence that defendant had an opportunity to restrain the crime and aid the victims but did nothing to discourage the use of violence or help the captive victims. Defendant was older than fellow gang member Combs, and there is no reason apparent in the record why defendant would have felt compelled to go along with the violent crime without protest. Even assuming defendant was not present when Combs actually shot Adams, defendant still could have taken other steps to encourage Combs to leave the apartment without shooting Adams and Wilson.

The totality of the evidence just summarized is substantial and supports the trial court's reckless indifference finding. Defendant focuses on two points in urging the contrary, but neither is convincing. He argues the trial court's finding that defendant knew one of his codefendants would be armed with a gun is not sufficient to prove the requisite mental state. Defendant is correct that such knowledge alone is insufficient to

18

prove he acted with reckless indifference to human life, but our discussion to this point demonstrates that is not the only factor that supports the trial court's finding. Defendant also emphasizes the trial court's factual findings in his favor: he was not aware any of his confederates were likely to kill Adams or attempt to kill Wilson, it was unknown whether defendant knew of Combs' propensity for violence or likelihood of using lethal force, and defendant (and Fuller) apparently left the apartment before Combs shot Adams and Wilson. None of these findings, however, compel a conclusion that defendant lacked the ability to restrain the crime.

### C. *The Section 1172.6 Procedure Is Constitutional*

Defendant contends the constitution requires a jury, not a trial judge, to determine whether he is entitled to relief under section 1172.6. He argues that due process and equal protection guarantees require such a result because an individual who today is tried on the same offenses would have a jury determine the relevant issues, not the trial judge.

The Due Process Clause of the Fourteenth Amendment and the jury-trial guarantee of the Sixth Amendment, "[t]aken together, . . . indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 476-477.) Section 1172.6 petitioners, however, are not criminal defendants charged anew with murder and therefore constitutionally entitled to a jury trial. Rather, they are individuals who have been convicted of murder, whose convictions are final, and who can *constitutionally* be punished for murder despite the ameliorative changes to the

19

law of murder enacted by Senate Bill 1437.  (See, e.g., *People v. Conley* (2016) 63 Cal.4th 646, 656 ["the Legislature . . . may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal law amendments if it so chooses"].)  In other words, section 1172.6 "is 'an act of lenity' that requires, under specified circumstances, reduction of the offense for which [a defendant] was properly convicted."  (*People v. James* (2021) 63 Cal.App.5th 604, 609.)  "No constitutional provision required the Legislature to authorize relief under the conditions specified in section [1172.6] and none compels it to make the conditions subject to jury determination."[15]  (*Ibid.*; see also *People v. Howard* (2020) 50 Cal.App.5th 727, 740.)

Defendant's reliance on the Equal Protection Clause fares no better.  "'[T]he 14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time.' [Citation.]" (*People v. Floyd* (2003) 31 Cal.4th 179, 191.)  Rather, "'[t]he Legislature properly may specify that such statutes are prospective only, to assure that penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written.' [Citation.]"  (*Id.* at 188; see also *People v. Lizarraga* (2020) 56 Cal.App.5th 201, 210 ["'Retroactive application of a punishment-mitigating statute is not a question of constitutional right but of legislative intent'"].)

---

[15]   Defendant argues Senate Bill 1437 was not an act of lenity because it does not involve discretionary sentencing procedures. While some acts of lenity have involved discretionary sentencing procedures, defendant points to no authority (and we are aware of none) holding that only such procedures can constitute acts of lenity.

D. *Passage of Senate Bill No. 775 Does Not Require a Remand*

At the time the trial court denied defendant's section 1170.95 petition, the relief available under that statute applied only to those convicted of murder. (Former § 1170.95, subd. (a); Stats. 2018, ch. 1015, § 4.) As previously mentioned, Senate Bill No. 775 expanded the statute to apply to convictions for attempted murder as well.

Defendant argues this expansion requires us to remand the matter to the trial court for a hearing on his eligibility for resentencing on the attempted murder conviction. The People, in turn, argue defendant would have to file a new resentencing petition for relief on the attempted murder conviction. They further argue that defendant is ineligible for relief as a matter of law in any event, citing the absence of a jury instruction on attempted murder under the natural and probable consequences doctrine.

We will assume for argument's sake that defendant is entitled to rely in this appeal on amendments made by Senate Bill No. 775. But even as so amended, the statutory scheme applies only to attempted murder convictions that are predicated on the natural and probable consequences doctrine. (§ 1172.6, subd. (a) ["A person convicted of . . . attempted murder under the natural and probable consequences doctrine . . . may file a petition"].) The jurors in this case were not instructed on that doctrine as to the attempted murder count. They were instead instructed on a theory of direct aiding and abetting, as well as on attempted murder and premeditation and deliberation in attempted murder. The jury was advised that an attempted murder conviction required a finding that "the defendant

21

intended to kill [the victim]."[16]  Direct aiding and abetting remains a valid theory of attempted murder after the enactment of Senate Bill No. 775.  (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 197.)  Defendant is thus ineligible for resentencing as a matter of law, and no remand is necessary.

---

[16]    Defendant concedes the jury was not instructed on the natural and probable consequences doctrine as to the attempted murder count.  He nevertheless contends this does not mean he is ineligible for relief because the court's instructions on felony murder, in combination with its aiding and abetting instructions and in light of the evidence presented, could have led the jury to conclude attempted murder was a natural resulting consequence of the underlying burglary and robbery.  The argument is unavailing; we proceed on the understanding that the jury properly followed the instructions it was given.  (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1336 [reviewing court must assume the jury properly followed the instructions provided].)

DISPOSITION

The order denying defendant's petition for resentencing under section 1172.6 is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

KIM, J.